UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JASON SEDDON,

    Plaintiff,

v.

MAYTAG CORPORATION,

    Defendant.

Case No. 04-cv-4058-JPG

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion for summary judgment filed by defendant Maytag Appliances – Herrin Laundry Products, a division of Maytag Corporation ("Maytag") (Doc. 19). Plaintiff Jason Seddon ("Seddon") has responded to the motion (Doc. 61). The Court also considers Maytag's motion to strike (Docs. 67), to which Seddon has responded (Doc. 70), and Maytag's motion for leave to submit an affidavit (Docs. 71 & 73). The Court construes Maytag's motion for leave to submit an affidavit as a reply to Seddon's response to its motion for summary judgment. The Court will therefore grant the motion (Docs. 71 & 73) and consider the affidavit in conjunction with the motion for summary judgment. For the purposes of making a complete record, the Court will allow Maytag a brief opportunity to electronically file the supplemental affidavit as a reply.

**I.**    **Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must

construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396. This standard is applied with special scrutiny in cases, such as employment discrimination or retaliation cases, that often turn on issues of intent and credibility. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

**II.    Facts**

    A.    <u>Motion to Strike (Doc. 67)</u>

As a preliminary matter, the Court must define what evidence it will consider when ruling on this motion. Maytag has asked the Court to strike certain pieces of evidence offered by Seddon in opposition to the motion for summary judgment (Doc. 67).

1.      Coffel Affidavit

First, Maytag asks the Court to strike the affidavit of Ron Coffel in its entirety on the grounds that it contains statements that are irrelevant and that it is not made on personal knowledge. Seddon argues that Coffel's affidavit is relevant to impeach the credibility of another witness, Dr. Daniel J. Kitchens ("Dr. Kitchens"). The Court need not consider the merits of either side's arguments because Seddon has not submitted Coffel's affidavit to support his response to Maytag's summary judgment motion and has not cited to that affidavit anywhere within his response. Thus, there is no need to strike it, and the Court will deny this request as moot.

2.      Thompson Affidavit

Maytag also asks the Court to strike portions of the affidavits submitted by Nina Thompson ("Thompson") on the grounds that the statements therein are irrelevant and that Seddon did not disclose Thompson in his initial or any updated disclosures or discovery responses. Seddon argues that Thompson's affidavit is relevant to demonstrate Maytag's animus towards workers who file workers' compensation claims and that the failure to disclose her was both justified and harmless.

Seddon does not contest that he did not comply with Federal Rule of Civil Procedure 26 when he failed to timely identify Thompson as a witness in a supplement either to his initial disclosures or his responses to interrogatories. Rule 26(a)(1)(A) requires a party to disclose initially "the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses . . . identifying the subjects of the information." Rule 26(e) imposes a duty to seasonably supplement these initial disclosures when a party acquires additional relevant information. No

3

rule limits this obligation to supplement discovery to the discovery period ordered by the Court.

Maytag asks the Court to strike Thompson's affidavit pursuant to Rule 37(c)(1). That rule provides, in pertinent part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or information not so disclosed.

Exclusion of evidence that was not disclosed "is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998); *accord David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The Court has broad discretion, however, to determine whether the non-disclosing party's failure to comply with Rule 26 is justified or harmless. *David*, 324 F.3d at 857; *Salgado*, 150 F.3d at 739; *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996). In making these determinations, the Court should consider:

> (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date.

*David*, 324 F.3d at 857.

In this case, Seddon has not shown that the failure to disclose Thompson was substantially justified. Seddon's attorney has submitted an affidavit in which he states that he first became aware of Thompson's relevance to this case on March 26, 2005, but was unable to reduce her statements to an affidavit until June 2005. He argues that Maytag timely received notice of Thompson's existence when he filed his response to Maytag's summary judgment

motion on June 15, 2005.[1]  However, Seddon does not explain how this timeline can be accurate in light of the fact that Thompson's affidavit is dated May 10, 2005.  The Court will not credit a self-serving and contradictory affidavit that is clearly and inherently inconsistent with documentary evidence presented by the same party.  Thus, it is clear that Seddon knew of Thompson's existence on March 26 and had obtained an affidavit from her on approximately May 10 but did not give Maytag any indication of her existence until June 15, nearly three months after he knew about her and more than a month after she had reduced her statements to an evidentiary form.  Seddon offers no explanation for those delays.  That Seddon's failure to disclose Thompson occurred after discovery was closed is irrelevant.  Accordingly, the Court finds that he has not shown that the failure to disclose Thompson, either in a supplement to his initial disclosures or to his answers to interrogatories, was justified.

The Court finds, however, that Seddon's failure to disclose Thompson is harmless.  Even considering her testimony, Maytag is entitled to prevail on its motion for summary judgment, as explained below.

### 3. Seddon Affidavit, Dr. Kitchens Deposition and Medical Records

Seddon seeks to strike portions of Seddon's affidavit, Dr. Kitchens' deposition and his medical records of other Maytag employees on the grounds that they are irrelevant, conclusory or not made with firsthand knowledge.  The Court will address each material objection as necessary as it sets forth the facts of this case.

---

[1] The original filing was stricken because it did not comply with the Court's electronic filing rules.  Nevertheless, Maytag received a copy of Thompson's affidavit at that time and was therefore charged with notice of her existence.

B.     Construing the Evidence

Construing the evidence in the light most favorable to Seddon, and drawing all reasonable inferences in his favor, the admissible evidence establishes the following facts.

Seddon was first hired by Maytag in October 1998. On November 4, 2002, he fell at work and injured his back. Shortly thereafter he claimed accident/sickness benefits from Maytag, indicating on the claim form that he also intended to file a workers' compensation claim. On the recommendation of a Maytag-employed physician, Maytag placed Seddon on a light duty assignment. Within a month, on December 2, 2002, Seddon filed a workers' compensation claim with the Illinois Industrial Commission (now known as the Illinois Workers' Compensation Commission). Almost three weeks later, on the recommendation of Seddon's chiropractor, Seddon stopped work completely and remained off work for approximately six months. Pursuant to the collective bargaining agreement governing Seddon's employment, every thirty days Seddon provided a written note from another one of his doctors, Dr. Corder, confirming that Seddon was still unable to work. Seddon received accident/sickness benefits throughout his leave.

In February 2003, Maytag required Seddon to get an independent medical exam ("IME") by Dr. Kitchens, a neurosurgeon.[2] Maytag regularly called on Dr. Kitchens to perform IMEs on its employees who suffered from injuries, and Dr. Kitchens often found that the employees were

---

[2] Seddon argues that the fact that Maytag choose Dr. Kitchens, whose office is in St. Louis, to conduct the IME supports the inference that Maytag was not looking for an objective examination. This is not a reasonable inference based on the location of Dr. Kitchens' office.

6

fit to return to work.[3]  In fact, eleven of those he examined continued to be employed in their regular positions by Maytag until at least July 2005.  Dr. Kitchens found Seddon able return to work  in February 2003 after reviewing his MRI and examining him for approximately ten minutes.  Nevertheless, Seddon remained on medical leave based on Dr. Corder's notes until June 2003.  No one involved with Maytag ever suggested that Seddon was faking his injury or gave him trouble about claiming accident/sickness benefits

On June 26, 2003, Dr. Corder indicated that Seddon had recovered sufficiently to return to work on June 28, 2003, and Seddon began working again.  Nevertheless, his injury still caused him pain, and on July 21, 2003, Dr. Corder restricted Seddon to light duty, that is, no bending or heavy lifting.  The next day Maytag's Senior Workers' Compensation and Medical Services Specialist Marie Brasher ("Brasher") informed Seddon that Maytag had no light duty positions

---

[3]Seddon notes that over nearly six years Dr. Kitchens found twenty-two of the twenty-four Maytag employees he examined to be able to work without restrictions and recommended none for surgery.  Seddon argues that this supports the inference that Dr. Kitchens' evaluations were either incomplete, inaccurate or insincere and that Maytag knew it could rely on Dr. Kitchens to find an employee able to return to regular work duties regardless of his or her true condition.  In the absence of any conflicting evidence about the actual medical condition of the employees Dr. Kitchens examined and/or statistically significant data about the frequency that other doctors like Dr. Kitchens found similarly situated employees able to return to work, it is not reasonable to draw such inferences.

Seddon also points to the short duration of the IME, Dr. Kitchens' compensation for conducting IME's for Maytag, his lack of understanding of Illinois' workers' compensation system or the attorney-client relationship between Maytag and its counsel, and his professed ignorance that Maytag employees were sent to him in conjunction with workers' compensation proceedings in light of the "workers' comp" notations in his files.  He argues that these facts support the inference that Dr. Kitchens' IME of Seddon was biased and that Maytag knew this.  Again, this is not a reasonable inference based on the evidence.

Even taking viewing as a whole all the evidence Seddon uses to argue that Dr. Kitchens' IMEs are not medically sound, the Court finds that it is not reasonable to draw such an inference.

available and that Maytag would credit Dr. Kitchens's IME, which found that Seddon could return to his regular duty position, over Dr. Corder's assessment that Seddon could only perform light duty. Brasher's response comported with Maytag's informal policy of generally crediting an IME over a conflicting assessments from an employee's personal physician. Seddon stopped working again on July 22, 2003. Three other Maytag employees were assigned to light duty positions at that time, two of whom had workers' compensation claims pending and one of whom did not.

Maytag treated Seddon as if he were on a medical leave of absence. On August 26, 2003, Maytag's Medical Services Department notified then-Manager of Employee Relations Janice McConnaughy ("McConnaughy") that Seddon's medical excuses were not up to date. McConnaughy then wrote Seddon a letter reminding him of his obligation under the collective bargaining agreement to reapply for a leave of absence every thirty days and asking for Seddon to provide a doctor's excuse for his recent absence. It also warned him that if he did not contact a Maytag representative by September 2, 2003, and provide a doctor's excuse by September 9, 2003, Maytag would assume that he wished to terminate his employment with Maytag.

Seddon received but did not respond to McConnaughy's August 26 letter, and on September 11, 2003, McConnaughy sent Seddon a letter informing him that he was terminated because he had failed to produce a doctor's excuse in response to her August 26 letter. The decision to terminate Seddon was made solely by McConnaughy and was consistent with her policy of terminating individuals on leave who did not respond in some way to letters like those she sent to Seddon requesting a medical excuse. In fact, in 2003 and 2004, Maytag terminated seventeen employees for failing to provide a medical excuse for a leave of absence after receiving a request to do so. Five of those had active workers' compensation claims at the time

of their discharge, two had previously filed claims, and ten had never filed a claim.

Seddon's workers' compensation claim settled. Maytag originally challenged the claim pursuant to a general policy of challenging all claims regardless of their apparent merit or legitimacy,[4] but ultimately settled the claim with him.

After Maytag terminated Seddon, Seddon obtain other employment but at reduced pay.

On January 20, 2004, Seddon filed a state court action alleging that Maytag constructively fired him in July 2003 by refusing to offer him a light duty assignment. He claims that this was in retaliation for filing a workers' compensation claim and seeks compensatory and punitive damages. Maytag removed the case to federal court on the basis of diversity jurisdiction and filed a motion for summary judgment. It argues that Seddon cannot demonstrate a causal connection between the filing of his workers' compensation claim and Brasher's decision not to offer him light duty or McConnaughy's decision to fire him. It further argues that it did not constructively fire Seddon in July 2003 but actually fired in him September 2003 for reasons that Seddon cannot prove are pretextual.

### III.   Analysis

Illinois law forbids an employer to retaliate against an employee because he filed a claim under the Workers' Compensation Act, 820 ILCS 305/1 *et seq*. *Kelsay v. Motorola, Inc.,* 384 N.E.2d 353, 357 (Ill. 1978); 820 ILCS 305/4(h). In order to prevail on a workers' compensation

---

[4]Seddon has presented affidavit testimony that Brasher admitted she was required to deny all workers' compensation claims against Maytag. As a matter of law, however, Maytag does not make the decision to grant or deny such claims. That authority rests solely with the Illinois Workers' Compensation Commission (formerly known as the Illinois Industrial Commission) or a reviewing court. *See* 820 ILCS 305/18 & 305/19. In light of the law, the only reasonable interpretation of Brasher's statement is that Maytag required Brasher to challenge all claims.

retaliatory discharge claim under Illinois law, a plaintiff must ultimately show that he

> (1) was the defendant's employee before his or her injury; (2) exercised a right granted by the Workers' Compensation Act; and (3) was discharged from his or her employment with a causal connection to his or her filing a workers' compensation claim.

*Tullis v. Townley Eng. & Mfg. Co., Inc.*, 243 F.3d 1058, 1062 (7th Cir. 2001); *accord Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 767 (7th Cir. 1994). Illinois law does not recognize a retaliatory discharge cause of action for anything short of actual termination. *See Zimmerman v. Buchheit of Sparta, Inc.*, 645 N.E.2d 877, 882 (Ill. 1994); *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707-08 (7th Cir. 2004). Furthermore, "[t]he element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Hartlein v. Illinois Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992); *accord Hiatt*, 26 F.3d at 767.

At the summary judgment stage, if a retaliatory discharge claim is in federal court, the plaintiff may use a direct method or an indirect, burden-shifting method. *Hiatt*, 26 F.3d at 767. *But cf. Carter v. Tennant Co.*, 383 F.3d 673, 678 (7th Cir. 2004) (questioning availability of indirect, burden-shifting method in federal court for state law retaliatory discharge claims); *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000) (Posner, J., concurring) (same). *Compare Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 407-08 (Ill. 1998) (burden shifting mechanism unavailable in state court). Seddon believes he can withstand summary judgment using either the direct or indirect method.

A. <u>Direct Method</u>

Under the direct method, the plaintiff must present evidence of a causal connection between a statutorily protected activity and an adverse action taken by the employer. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004); *Stone v. City of Indianapolis Pub.*

*Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see Hiatt*, 25 F.3d at 768-69. Under the direct method of proving retaliation, the plaintiff may rely on direct evidence of an acknowledgment of retaliatory intent or on circumstantial evidence sufficient to provide a basis for inferring retaliation. *Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003). "Direct evidence essentially requires an admission by the decisionmaker that his actions were based upon the prohibited animus." *Id.* at 753 (internal quotations omitted); *see Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001). Circumstantial evidence, on the other hand, is "evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Rogers*, 320 F.3d at 753. Circumstantial evidence can include "(1) suspicious timing, ambiguous statements, etc., (2) evidence that similarly situated employees were treated differently, or (3) evidence that the employee was qualified and passed over for the job and the employer's reason for the difference in treatment is a pretext for discrimination." *Gorence v. Eagle Food Ctrs.*, 242 F.3d 759, 762 (7th Cir. 2001).

Maytag challenges Seddon's ability to establish the third element of his retaliatory discharge claim – that there was a causal connection between the filing of his workers' compensation claim in December 2002 and his termination in September 2003. Seddon argues that circumstantial evidence creates a "convincing mosaic" that Maytag retaliated against him for filing his workers' compensation claim. Contributing to this "mosaic," Seddon argues, are (1) Maytag's animus toward workers' compensation claimants as reflected in its policy of contesting all claims regardless of their merit and (2) Maytag's policy of relying on Dr. Kitchens' reports over those of treating physicians.[5]

---

[5]Seddon does not argue that the temporal proximity between when he filed his workers' compensation claim and when Maytag terminated him at least seven months

Before delving too deeply into this discussion, it is necessary to clarify the employment action Seddon claims to be retaliatory. His complaint and response to the motion for summary judgment indicate that he believes he was fired in July 2003 when Brasher told him she had no light duty work for him. Seddon apparently viewed Brasher's July 2003 actions as a "constructive discharge" because he was told to stop working and he did not get paid. The evidence shows, however, that beginning in July 2003 Maytag treated Seddon as if he was on leave and that it did not actually fire him until September 2003. Unfortunately for Seddon, as noted above, Illinois law does not recognize a retaliatory discharge cause of action for anything short of actual termination. *See Zimmerman v. Buchheit of Sparta, Inc.*, 645 N.E.2d 877, 882 (Ill. 1994); *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 707-08 (7th Cir. 2004). Therefore, Brasher's actions in July 2003 cannot serve as the basis for this retaliatory discharge claim, which must then be based on McConnaughy's September 11, 2003, decision to terminate Seddon.

There is simply no evidence from which a reasonable jury could find that McConnaughy's decision to terminate Seddon was causally connected to his filing a workers' compensation claim. Seddon has presented no information to show that McConnaughy, the sole decisionmaker with respect to his termination, even knew he had filed a workers' compensation claim. Without such knowledge, Seddon's workers' compensation claim could not have played any role in McConnaughy's decision to terminate him.

---

later is significant to this case. The Court believes he is right not to press this argument, for in order to establish a causal relationship, the employer's action must be fairly soon after the employee engages in protected activity. *Clark Co. Sch. Dist. v. Breeden*, 121 S.Ct. 1508, 1511 (2001) (*per curiam*) (Title VII context). *See, e.g., Juarez v. Ameritech Mobile Comm., Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (six months insufficient). It was not in this case.

Furthermore, Seddon has not presented sufficient evidence to show that Maytag's proffered reason for Seddon's termination is a pretext for retaliation. Pretext can be established by showing that the employer did not honestly believe the reasons it gave for its action and is just "covering its tracks." See *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). In this case, the evidence clearly shows that McConnaughy made her decision pursuant to an established policy after Seddon failed to respond to her August 26 letter in which she warned him that if he did not respond, Maytag would consider his employment terminated. She had enforced this policy to terminate seventeen employees, seven of whom had filed workers' compensation claims and ten of whom had not. There is no indication that McConnaughy established this policy to get at workers' compensation filers or that she applied the policy in such a manner as to target them. Seddon has presented no evidence that calls into question the sincerity of McConnaughy's proffered reasons for terminating Seddon.

Even if the Court were to consider Brasher's July 2003 decision not to offer Seddon a light duty assignment as a discharge, the evidence is not such that a reasonable jury could find any causal connection to Seddon's workers' compensation claim. The Court is hesitant to find that an employer who initially contests workers' compensation claims regardless of their apparent merit exhibits animus toward those making the claim. That would be akin to saying that any defendant who chooses to file an answer in a lawsuit instead of immediately conceding an apparently meritorious claim exhibits animus toward the plaintiff. In reality, defendants often answer apparently meritorious claims in a good faith effort to use the legal process to flesh out the allegations to ensure that, in fact, they do have merit and to provide a basis for settlement discussions. That appears to be exactly what Maytag did in Seddon's workers' compensation

proceedings, which resulted in a settlement without exhaustion of the procedures set forth in the Workers' Compensation Act. In the absence of any other evidence of hostility toward workers' compensation claims or claimants – or Seddon in particular – any "animus" that is established by simply initially contesting a claim can only reasonably reflect a desire not to pay judgments or claims that have no merit.

Seddon also argues that Maytag's use of Dr. Kitchens to perform IMEs of workers' compensation claimants exhibits animus toward the claimants. As noted earlier in this memorandum, the circumstances surrounding Maytag's relationship with Dr. Kitchens and the performance of his IMEs are not suspicious, and any opinion that his IMEs are biased or unsound is pure speculation. It further cuts against Seddon's argument that at least eleven of those he examined were, as Dr. Kitchens found, healthy enough to return to work and remain employed by Maytag in their regular positions. If Maytag had animus toward workers' compensation claimants, it certainly did not apply that animus across the board.

Neither did it apply any such animus toward Seddon in particular. The evidence shows that Dr. Kitchens found Seddon able to return to work as early as February 2003. Nevertheless, Maytag allowed him to remain on medical leave claiming accident/sickness benefits for four months beyond Dr. Kitchens' diagnosis. Rather than exhibiting animus toward Seddon, the decision to forebear from requesting him to return to work in February 2003 exhibits a decided lack of animus. Similarly, Seddon testified that no one involved with Maytag ever suggested that he was faking his injury or gave him trouble about claiming accident/sickness benefits.

Even if such evidence could be construed to establish animus toward workers' compensation claims, Seddon has not established that this animus was in any way causally related to Brasher's decision not to assign him a light duty job. *See Hiatt*, 26 F.3d at 768-69.

Seddon has presented no evidence that there was, in fact, a light duty position available for him. Furthermore, Seddon has not shown any retaliatory practice in assigning the light duty positions that were available; two of the three workers on light duty in July 2003 had filed workers' compensation claims. There is simply no evidence from which a reasonable jury could find that Brasher's failure to assign Seddon to light duty in July 2003 was causally connected to his filing a workers' compensation claim in December 2002.

For the foregoing reasons, the Court finds that Seddon cannot succeed in proving by the direct method his case of retaliatory discharge.

B.      Indirect Method

In order to withstand a motion for summary judgment on a retaliation claim using the indirect method, a plaintiff may rely on the *McDonnell Douglas* burden-shifting mechanism. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under that procedural device, a plaintiff must first establish a *prima facie* case by showing that (1) he engaged in a statutorily protected activity, (2) he performed his job according to his employer's legitimate expectations, (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 559 (7th Cir. 2004); *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). There is no need to show a causal connection using the indirect method. *Rhodes*, 359 F.3d at 508; *Stone*, 281 F.3d at 644. If the plaintiff establishes a *prima facie* case, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Hudson*, 375 F.3d at 559; *Rhodes*, 359 F.3d at 508. If the defendant is able to provide evidence of such a reason, the burden shifts back to the plaintiff

to show that the articulated reason is actually a pretext. *Hudson*, 375 F.3d at 559; *Rhodes*, 359 F.3d at 508.

Maytag concedes that Seddon can establish the first and third factors and, for the purposes of this motion only, that he can also prove the second factor. However, it contests Seddon's ability to prove the fourth factor of his *prima facie* case – that he was treated less favorably than coworkers who did not file workers' compensation claims – and his ability to prove pretext.

          1.        <u>Similarly Situated Coworkers</u>

To be similarly situated, employees must be "directly comparable . . . in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Those "material respects" depend on the specific situation involved in the case and may include whether the employees dealt with the same supervisor, were subject to the same standards, or had comparable experience, education and qualifications, if the employer took these factors into account when making the personnel decision in question. *Id.*

In this case, Seddon must point to other coworkers who did not file workers compensation claims and who were not terminated for failing to respond to a request from Maytag to update medical information. He has provided evidence of no such similarly situated individuals.[6]

---

[6]Seddon points to other individuals who had not suffered work-related injuries but who were given light duty assignments. This is not the relevant comparison group since, as the Court explained earlier, Seddon's termination occurred in September 2003, not in July 2003. Even if that were the relevant employer action, Maytag has presented evidence that two of the three other employees on light duty had filed workers' compensation claims. Thus, there is no evidence that Maytag treated non-filers worse than filers.

2. Pretext

Maytag has proffered as its legitimate, non-discriminatory reason for Seddon's termination his failure to respond to McConnaughy's August 26 letter. For the same reasons discussed in connection with Seddon's attempt to establish pretext under the direct method of proof, the Court finds that no reasonable jury could find that he can establish pretext under the *McDonnell Douglas* burden-shifting method.

Even if the Court were to consider Brasher's decision in July 2003 as the relevant employer action, Seddon has not presented any evidence from which a reasonable jury could find that Brasher's refusal to give Seddon light duty in view of Dr. Kitchens' IME was dishonest[7] or that her reliance on Dr. Kitchens' IME results was suspicious or in bad faith. On the contrary, her decision was pursuant to a policy of crediting the IME over an employee's personal physician – a policy which Maytag had bent *in Seddon's favor* since February 2003, when Dr. Kitchens first found Seddon able to work and *after Seddon had already filed his workers' compensation claim*. There is simply no evidence to show that Brasher's reason for refusing to assign Seddon to light duty was pretextual.

In sum, the Court finds that there is no evidence from which a reasonable jury could find that Seddon's worker's compensation claim was causally related to his termination. There is no genuine issue of material fact, and Maytag is entitled to summary judgment as a matter of law.

---

[7]An employer is not obligated to offer an employee light duty assignment when he is unable to perform his regular job. *Hartlein v. Illinois Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992).

IV.     Conclusion

For the foregoing reasons, the Court

- **GRANTS** Maytag's motion for leave to submit an affidavit (Docs. 71 & 73);

- **ORDERS** that Maytag shall file the supplemental affidavit as a reply on or before August 26, 2005;

- **GRANTS in part** and **DENIES in part** Maytag's motion to strike (Doc. 67) as described herein;

- **GRANTS** Maytag's motion for summary judgment (Doc. 19); and

- **DIRECTS** the Clerk of Court to enter judgment accordingly after Maytag files its reply (the supplemental affidavit).

**IT IS SO ORDERED.**
**DATED:  August 23, 2005**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**
